**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| CUTTER, LLC<br>*Plaintiff*,<br><br>v.<br><br>CAPITOL PAYMENT SYSTEMS, INC.<br>*Defendant*. | Civil No. ELH-26-00348 |

**MEMORANDUM OPINION**

The Memorandum Opinion concerns a motion to compel arbitration (ECF 12) filed by defendant Capitol Payment Systems, Inc. ("CPS") in a contract dispute lodged by plaintiff Cutter, LLC ("Cutter"). ECF 1 (the "Complaint").[1] Jurisdiction is founded on diversity of citizenship. *Id.* ¶ 6; *see* 28 U.S.C. § 1332(a)(1).

Cutter asserts two claims in the Complaint. In Count I, Cutter alleges breach of contract, for which plaintiff seeks damages of at least $142,656.23. *Id.* ¶¶ 29–39; *id.* at 8. In Count II, Cutter alleges that CPS is unjustly enriched by retaining residual payments that are allegedly due to Cutter. Therefore, Cutter seeks to have CPS place those residuals in a constructive trust for Cutter's benefit. *Id.* ¶¶ 40–46.

Pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1–16, CPS has filed a "Motion to Compel Arbitration and Dismiss the Complaint." ECF 12. The motion is supported by a memorandum of law. ECF 12-1 (collectively, the "Motion"). According to CPS, Cutter's claims

[1] Throughout the Memorandum, the Court cites to the electronic pagination, except where paragraph or section numbers are available. Electronic pagination may not correspond to the page numbers imprinted on a particular submission.

arise from rights assigned under an agreement that contains a mandatory arbitration provision. ECF 12 at 1.

Cutter opposes the Motion. ECF 16. It maintains that its claims arise from a separate agreement and that Cutter has not consented to arbitration. *Id.* at 1. CPS did not reply.

The Motion is fully briefed, and no hearing is necessary to resolve it. *See* Local Rule 105.6. For the reasons set forth below, I shall deny the Motion.

## I. Factual Background

Cutter is a limited liability company organized under the laws of Tennessee, with its principal place of business in Lewisburg, Tennessee. ECF 1, ¶ 4. David Daily and Karen Daily, who are the sole members of Cutter, are citizens of Tennessee. *Id.*

CPS is a Maryland corporation with its principal place of business in Riva, Maryland. ECF 1, ¶ 5. Its business is to provide "payment processing services to merchants and enter agreements with independent marketing agents who solicit and service merchant accounts." ECF 12-1 at 2.

On October 23, 2020, CPS entered into an "Independent Marketing Agreement" (ECF 12-1, the "Marketing Agreement") with Processing, Inc. ("Processing"), a Louisiana corporation with its principal place of business in Louisiana. *Id.* at 2.[2] Cutter is not a party to the Marketing Agreement. *Id.* And, Processing is not a party to this case.

Under the Marketing Agreement, Processing, designated as "Agent," "agreed to solicit merchants for CPS's payment processing services and provide related support services." *Id.* (citing ECF 12-2, ¶ 3(a)). The Marketing Agreement provides for compensation to Processing in the form

[2] The Marketing Agreement identifies Processing by the name of "Processing Solutions Inc." ECF 12-2 at 1. However, plaintiff refers to the company as "Processing, Inc." And, that is the name that appears in the "Redirection And Consent Agreement." *See* ECF 1-2.

of transaction fees generated by accounts it referred to CPS (the "Residuals" or "Residual payments"). ECF 1, ¶ 2.

The Marketing Agreement includes a mediation and arbitration clause that requires the parties, in most circumstances, to resolve disputes through mediation and/or arbitration. ECF 12-2, § 15. The clause states, in full, *id.*:

> MEDIATION AND ARBITRATION. If any dispute between CPS and Agent arising under this Agreement cannot reasonably be resolved by the parties through mutual negotiation, the parties hereto agree that the claim or dispute will be resolved by mediation and/or arbitration as set forth in this Paragraph 15. Except under circumstances where there is a reasonable likelihood that a serious injury to the rights of a party may occur with respect to which there exists a reasonable possibility that the injured party will not be recompensed even after obtaining an award in arbitration, any dispute under this Agreement will first be submitted to informed and non-binding mediation before an impartial mediator or referee acceptable to both parties, who will hear the issues and guide the parties to a fair and equitable resolution. If the dispute or claim cannot be resolved through mediation, the parties hereby agree that the matter will then be submitted to and decided by arbitration under the Commercial Arbitration Rules of the American Arbitration Association, and judgement upon the award rendered by the arbitrator(s) may be entered in any court[3] having jurisdiction thereof. . . .

In addition, the Marketing Agreement provides that Processing "may assign, sell or transfer its rights to any Residual stream generated under this Agreement to a CPS approved buyer." *Id.* § 5(b).

On October 27, 2023, CPS, Cutter, and Processing entered into a Redirection and Consent Agreement. ECF 1-2 (the "Redirection Agreement"). The Redirection Agreement provides that "CPS will pay all future Residuals due in connection with the Marketing Agreement[]" to Cutter. *Id.* § 2. As required by the Marketing Agreement, CPS consented to Processing's assignment to Cutter of its contractual right to Residual payments. *Id.* § 1. Additionally, in the event of a breach

---

[3] On January 22, 2023, CPS and Processing entered an Amendment to the Marketing Agreement. It states, in relevant part: "2. Section 17 paragraph 1 Line 3 and throughout Section 17 shall be amended by the addition of the following, 'The legal venue shall be Anne Arundel County, Maryland.'" ECF 12-3 at 2.

of the Marketing Agreement by Processing, Cutter has the "option (but not the obligation) to cure any such breach to ensure the continuation of Residual payments." *Id.* § 2. In addition, CPS waived "any breach or right of termination" that would follow from prior acts of Processing. *Id.* § 4. Moreover, under the Redirection Agreement, Cutter agreed to provide "customary merchant services" to the merchants "from which the Residuals are derived." *Id.* §3.

Plaintiff alleges that in or about July 2025, CPS ceased to make the monthly Residual payments required under the Redirection Agreement. ECF 1, ¶ 19. Cutter asserts that, as of January 28, 2026, when suit was filed, CPS had withheld approximately $142,656.23 in Residuals. *Id.* ¶ 20.

Further, plaintiff asserts that, after CPS ceased payment of Residuals, CPS claimed that its non-payment was justified by a breach of the Marketing Agreement by Processing. *Id.* ¶ 21. Plaintiff asserts that CPS issued a "purported formal notice of breach" on or about August 18, 2025. *Id.* However, plaintiff alleges that the notice was sent "using an unknown and invalid address for Processing." *Id.* ¶ 22. Further, Cutter alleges that, following an internal investigation by Cutter and Processing, no breach was found. *Id.* ¶ 23. And, despite plaintiff's repeated requests to Cutter for specific information to support the alleged breach, defendant never provided the requested information.

Moreover, plaintiff alleges that "the principal of Processing advised Cutter that CPS had instructed Processing to ignore the notice of breach and that no action was required by Processing." *Id.* ¶ 24. Yet, according to plaintiff, as of the filing of the Complaint, plaintiff continues to fulfil its obligations under the Redirection Agreement. *Id.* ¶ 28.

Additional facts are included in the Discussion.

## II. Legal Standard

### A.

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16, which was enacted in 1925, "provides for the enforceability of arbitration agreements and specifies procedures for conducting arbitrations and enforcing arbitration awards . . . ." *McCormick v. Am. Online, Inc.,* 909 F.3d 677, 679 (4th Cir. 2018). Under the FAA, a written arbitration provision in a contract involving commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract or as otherwise provided in chapter 4." *Id.* § 2. Moreover, under the FAA, a party to an arbitration agreement may move to compel another party to that agreement to submit claims to arbitration. *Id.* § 4.

"Under the [FAA], arbitration is a matter of contract, and courts must enforce arbitration contracts according to their terms." *Henry Schein, Inc. v. Archer and White Sales, Inc.*, 586 U.S. 63, 63 (2019) (alteration added); *see Berkeley Co. Sch. District v. Hub. Int'l Ltd.*, 130 F.4th 396, 401 (4th Cir. 2025). But, "[b]efore referring a dispute to an arbitrator, . . . the court determines whether a valid arbitration agreement exists." *Coinbase, Inc. v. Syski*, 602 U.S. 143, 149 (2024) (alterations added) (cleaned up).

In *Meadows v. Cebridge Acquisition, LLC*, 132 F.4th 716 (4th Cir. 2025), the Fourth Circuit explained, *id.* at 726 (quoting *Adkins v. Lab. Ready, Inc.*, 303 F.3d 496, 500–01 (4th Cir. 2002)):

> Under the FAA, a litigant can compel arbitration if he can demonstrate "(1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the defendant to arbitrate the dispute."

Of relevance here, "a defendant who seeks to compel arbitration under the Federal Arbitration Act bears the burden of establishing the existence of a binding contract to arbitrate the dispute." *Minnieland Priv. Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co., Inc.*, 867 F.3d 449, 456 (4th Cir. 2017); *see Kemp v. Aroma 360, LLC*, ABA-25-1630, 2026 WL 513534, at *3 (D. Md. Feb. 24, 2026). The FAA reserves for trial the question of whether an arbitration agreement has been made, provided that a question of fact as to that issue is properly generated. *See* 9 U.S.C. § 4 ("If the making of the arbitration agreement . . . be in issue, the court shall proceed summarily to the trial thereof."). The Fourth Circuit has instructed that the district court, when determining whether an agreement to arbitrate exists, "must employ the summary judgement standard as a gatekeeper, so a trial only occurs if there are 'genuine issues of material fact.'" *Rowland v. Sandy Morris Fin. & Estate Planning Servs., LLC*, 993 F.3d 253, 258 (4th Cir. 2021) (quoting *Chorley Enters., Inc. v. Dickey's Barbecue Rests., Inc.*, 807 F.3d 553, 564 (4th Cir. 2015)); *see Adekson v. Comcast Cable Commc'ns, LLC*, 823 F. Supp. 3d 549, 554 (D. Md. 2026).

Notably, "[a]rbitration is 'strictly a matter of consent,' . . . and unless [defendant] can show that there 'already exist an enforceable arbitration agreement between the parties,' there is no presumption in favor of arbitration to be applied." *Marshall v. Georgetown Mem'l Hosp.*, 112 F.4th 211, 217 (4th Cir. 2024) (alterations added) (quoting *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 184 (2019) and *Raymond James Fin. Servs., Inc., v. Cary*, 709 F.3d 382, 385–86 (4th Cir. 2013)); *see Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.*, 489 U.S. 468, 479 (1989); *Jackson v. Protas, Spivok & Collins LLC*, 176 F.4th 317, 320 (4th Cir. 2026). Therefore, a party cannot rely on a "liberal federal policy favoring arbitration agreements . . . to assist in meeting [its] burden." *Marshall*, 112 F.4th at 217 (alterations added; internal quotations marks omitted) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)).

Indeed, "the Court's prior recognition of a federal 'policy favoring arbitration' was 'merely an acknowledgment of the FAA's commitment to overrule the judiciary's longstanding refusal to enforce agreements to arbitrate' and that 'the federal policy is about treating arbitration contracts like all others, not about fostering arbitration." *Rogers v. Tug Hill Operating, LLC*, 76 F.4th 279, 286 (4th Cir. 2023) (quoting *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022)).

Of import, "[w]hen there is no arbitration agreement between two parties, one of them cannot force the other to arbitrate." *Jackson*, 176 F.4th at 320. In other words, "'a court may submit to arbitration only those disputes . . . that the parties have agreed to submit.'" *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 302 (2010) (citation and some internal quotation marks omitted).

**B.**

Section 2 of the FAA creates "a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." *Id.* But, "[w]hether an agreement to arbitrate was formed is . . . a question of ordinary state contract law principles." *Marshall* 112 F.4th at 217 (internal quotation marks omitted) (quoting *Rowland*, 993 F.3d at 258); *see also Kemp*, 2026 WL 513534, at *4 n.2.

The Supreme Court has instructed that federal courts should generally "apply ordinary state-law principles that govern the formation of contracts," *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995), and the "federal substantive law of arbitrability." *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24, *see also see Minnieland Priv. Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co., Inc.*, 913 F.3d 409, 415 (4th Cir. 2019). To the extent that the Marketing Agreement is at issue in this Motion, it includes a choice-of-law provision

selecting Maryland law. ECF 12-2, ¶ 17. In contrast, the Redirection Agreement does not contain a choice-of-law provision. ECF 1-2.

**C.**

In *Jules v. Andre Balazs Properties*, 608 U.S. 200 (2026), the Supreme Court distinguished cases, as here, where "one party files a federal suit and the other responds by arguing that the dispute is arbitrable" (*id.* at 204), from cases where "a "freestanding" FAA motion [] arrive[s] in federal court outside of any pre-existing federal case." *Id.* at 205 (alterations added); *see Vaden v. Discover Bank*, 556 U.S. 49, 62 (2009) (concluding that § 4 of the FAA permits a court to assess jurisdiction by "looking through" a petition to compel arbitration and, instead, to the underlying dispute); *see also Badgerow v. Walters*, 596 U.S. 1, 5 (2022) (concluding that *Vaden*'s look-through approach does not apply to freestanding motions to confirm or vacate arbitral awards under § 9 or § 10 of the FAA). Of relevance here, a court that has jurisdiction over the suit when it is filed also has jurisdiction with regard to a motion to compel arbitration. Indeed, "'jurisdiction to decide a case includes jurisdiction to decide a motion' within that case, and 'usually there is no need to look through the motion in search of a jurisdictional basis outside the court.'" *Jules*, 608 U.S. at 209 (quoting *Badgerow*, 596 U.S. at 15) (cleaned up).

This Court has subject matter jurisdiction based on diversity jurisdiction, pursuant to 28 U.S.C. § 1332(a)(1). As noted, plaintiff is organized under the laws of Tennessee, where its principal place of business is located and its members are citizens. ECF 1, ¶ 4. Defendant is a corporation organized under the laws of Maryland, and its principal place of business is also in Maryland. *Id.* ¶ 5. Moreover, plaintiff alleges damages of at least $142,656.23, which exceeds the $75,000 amount in controversy threshold for diversity jurisdiction. *Id.* ¶ 38. Therefore, the Court also has jurisdiction as to the Motion.

## III. Discussion

The Fourth Circuit has recognized four requirements applicable to a motion to compel arbitration. *See Meadows*, 132 F.4th at 726. Neither party contests that there is a dispute here, that the transaction affects interstate commerce, and that plaintiff refuses to arbitrate. *See* ECF 12-1, ECF 16. The critical issue is whether there exists an arbitration provision that governs the dispute. *See Meadows*, 132 F.4th at 726.

The parties do not challenge the existence of an arbitration clause in the Marketing Agreement signed by CPS and Processing. ECF 12-1, ECF 16. And, they agree that Cutter was not a party to that agreement. *Id.* Likewise, the parties do not dispute that the Redirection Agreement, which was signed by CPS, Processing, and Cutter, does not, on its face, include an arbitration clause. *Id.* Rather, the parties dispute whether the arbitration clause in the Marketing Agreement binds Cutter, notwithstanding Cutter's status as a nonsignatory to that agreement.

CPS advances three arguments to support its conclusion that Cutter should be required to mediate and arbitrate its claim. First, CPS claims that Cutter is bound by the terms of the Marketing Agreement because its claims arise under that agreement. ECF 12-1 at 6–8. Second, CPS contends that Cutter is "bound by the arbitration provision in the Marketing Agreement under principles of equitable estoppel." *Id.* at 8–10 (capitals omitted). Third, CPS argues that Cutter is bound to arbitrate "as Processing's Assignee." *Id.* at 10–12. I address each argument in turn.

As noted, the standard here is akin to that for summary judgment. The burden is on CPS to establish that Cutter is bound to arbitrate the dispute. *See Rowland*, 993 F.3d at 258. And, to prevail, there can be no genuine dispute of material fact. *Id.*

### A. The Marketing Agreement

The Marketing Agreement requires that any dispute "arising under this Agreement" that

cannot reasonably be resolved through negotiation "will be resolved by mediation and/or arbitration." ECF 12-2, ¶ 15.

CPS argues that Cutter is bound to the arbitration clause contained in the Marketing Agreement because "the dispute constitutes one 'arising under' that Agreement and falls squarely within its arbitration provision." ECF 12-1 at 7 (citing *Gold Coast Mall, Inc. v. Larmer Corp.*, 298 Md. 96, 99, 468 A.2d 91, 93 (Md. 1983)).[4] CPS alleges that plaintiff's claims "depend upon rights created and governed by the Marketing Agreement." ECF 12-1 at 7. And, it asserts that "Cutter's claims arise directly from that contractual relationship" because the Redirection Agreement "does not establish an independent compensation scheme." *Id.* Rather, the Redirection Agreement merely redirects payments due under the Marketing Agreement. *Id.*

Further, CPS states: "Because the existence, calculation, and enforceability of those payments are governed by the Marketing Agreement, resolution of Cutter's claims necessarily turns on interpretation of that Agreement." *Id.* (citing *Gen. Elec. Cap. Corp. v. Union Corp Fin. Grp. Inc.*, 142 F. App'x 150, 152 (4th Cir. 2005) ("The scope of an arbitration clause in one contract can extend to a dispute arising under a second contract, provided that the dispute "significantly relates" to the first agreement.")). And, CPS argues that, "even if Cutter were to contend that its claims do not fall squarely within the phrase 'arising under,' any doubt concerning the scope of arbitrable issues must be resolved in favor of arbitration." ECF 12-1 at 7 (citing *Krueger v. Angelos*, 26 F.4th 212, 217 (4th Cir. 2022)).

Cutter advances several points in response. First, Cutter posits that the Complaint only seeks relief under the Redirection Agreement and "does not seek to enforce any provision of the Marketing Agreement." ECF 16 at 10 (citing ECF 1, ¶¶ 29–39). Cutter asserts that the contractual

[4] The quoted text does not appear on the page cited in defendant's brief.

obligations under the Redirection Agreement are independent of the Marketing Agreement. ECF 16 at 10.

Second, Cutter argues that the case law cited by CPS "confirms that Cutter cannot be bound by the arbitration provision of the Marketing Agreement." *Id.* Specifically, Cutter contends that the Fourth Circuit's holding in *Gen. Elec. Cap. Corp.*, 142 F. App'x at 151, to the effect that an arbitration provision of an initial "overarching contract" governs a dispute of a subsequent assignment agreement, is limited to situations where the parties to the preceding and subsequent agreements are the same. ECF 16 at 10. Cutter claims that the present dispute is different because there is no assignment and the identities of the parties to the Redirection Agreement are not the same as the parties to the Marketing Agreement. ECF 16 at 10.

Plaintiff makes a similar point with respect to CPS's reliance on *Gold Coast Mall*, 298 Md. 96, 468 A.2d 91. ECF 16. Cutter asserts that *Gold Coast Mall* only addressed "the applicability of an arbitration clause as between parties that actually executed the underlying agreement." *Id.* (citing *Gold Coast Mall*, 298 Md. at 105, 468 A.2d at 96). And, states Cutter, *Gold Coast Mall* did not permit "the enforcement of an arbitration provision against a non-signatory based solely on its relationship to contracting parties." ECF 16 at 11. Instead, Cutter claims that "the court reaffirmed that a party 'cannot be required to submit any dispute to arbitration that it has not agreed to submit.'" *Id.* (quoting *Gold Coast Mall*, 298 Md. at 103, 468 A.2d at 95).

Further, Cutter emphasizes that case law firmly supports the proposition that "'a non-signatory or non-party to an arbitration agreement *cannot* be forced to arbitrate disputes against their will.'" ECF 16 at 12 (quoting *Curtis G. Testerman Co. v. Buck*, 340 Md. 569, 584, 667 A.2d 649, 656 (1995)) (emphasis in original). Cutter maintains that because it is not a party to the Marketing Agreement, it cannot be bound by the arbitration provision in it. ECF 16 at 12.

Moreover, because no such provision was included in the Redirection Agreement, to which Cutter is a party, Cutter insists that CPS cannot compel Cutter to arbitrate. *Id.*

Last, Cutter contends that *Krueger*, 25 F.4th 212, is "inapplicable to the issues presented here." ECF 16 at 11. According to Cutter, *Krueger* is distinct because it involved an arbitration requirement under a federal statute, whereas the present conflict involves private contracts between parties. *Id.*

CPS focuses on the assertion that Cutter's claims "directly arise from" the Marketing Agreement, but it does not address any issue of contract formation. ECF 12-1 at 7. Essentially, it presents an argument about the scope of the clause. However, as Cutter correctly recognizes (ECF 16 at 10–11), the cases CPS cites as authority involve facts where the parties to the suit and/or to the subsequent agreement are the same parties that signed an arbitration agreement. *See Gold Coast Mall*, 298 Md. 96, 468 A.2d 91; *Gen. Elec. Cap. Corp*. 142 F. App'x 150. Their holdings are merely about the scope of an arbitration agreement. Cutter handily distinguishes those cases on the ground that Cutter, unlike the parties in those cases, never signed any agreement with CPS containing an arbitration clause. ECF 16 at 8. On this basis, CPS does not carry its burden to demonstrate a binding contract to arbitrate.

For its part, as noted, Cutter directs the Court to the "'large body of law [that] supports the proposition that a non-signatory or non-party to an arbitration agreement *cannot* be forced to arbitrate disputes against their will.'" ECF 16 at 12 (quoting *Curtis G. Testerman Co.*, 340 Md. at 584, 667 A.2d at 656) (emphasis in original) (alteration in ECF 16). Yet, although it is true that a contract "cannot bind parties to arbitrate disputes they have not agreed to arbitrate, . . . a party can submit to arbitration by means other than personally signing a contract." *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 416 (4th Cir. 2000). The Fourth

Circuit has said that "in an appropriate case a nonsignatory can enforce, or be bound by, an arbitration provision within a contract executed by other parties." *Id.* at 416–17.

Specifically, the Court has followed the Second Circuit in recognizing that five theories, "'aris[ing] out of common law principles of contract and agency law' could provide a basis 'for binding nonsignatories to arbitration agreements: 1) incorporation by references; 2) assumption; 3) agency; 4) veil piercing/alter ego; and 5) estoppel.'" *Id.* at 417 (quoting *Thomson–CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995)); *see also Bel–Ray Co. v. Chemrite (Pty) Ltd.*, 181 F.3d 435, 440–43 (3d Cir. 1999); *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753, 757 (11th Cir. 1993); *Hughes Masonry Co. v. Greater Clark County Sch. Bldg. Corp.*, 659 F.2d 836, 840–41 (7th Cir. 1981) (citing cases).

CPS's first argument does not conform to any of these recognized theories for binding a third party to an arbitration clause. ECF 12-1 at 6–8. However, as noted, the Fourth Circuit recognizes principles of equitable estoppel as a basis to bind a nonsignatory to an arbitration agreement. CPS relies on this doctrine. ECF 12-1 at 8–10.

**B. Equitable Estoppel**

CPS argues that the doctrine of equitable estoppel requires Cutter to submit to arbitration under the Marketing Agreement. According to CPS, the doctrine of equitable estoppel "precludes a party from asserting rights 'he otherwise would have had against another' when his or her own conduct renders assertion of those rights contrary to equity." ECF 12-1 at 8 (quoting *First Union Commercial Corp. v. Nelson, Mullins, Riley, Scarborough (In re Varat Enters., Inc.)*, 81 F.3d 1310, 1317 (4th Cir. 1996)). Further, CPS asserts that equitable estoppel applies "where a non-signatory's claims are 'substantially interdependent' with, and rely upon, the same operative facts

and contractual duties as an agreement containing an arbitration clause." ECF 12-1 at 9 (quoting *Brantley v. Republic Mortg. Ins. Co.*, 424 F.3d 393, 396 (4th Cir. 2005)).

According to CPS, Cutter's claims ultimately depend on the terms of the Marketing Agreement. *See* ECF 12-1 at 9. CPS states: "Absent the Marketing Agreement, Cutter would possess no asserted entitlement to those payments and no basis for relief." *Id.* at 10. Therefore, CPS concludes: "Because Cutter seeks to enforce contractual rights arising from the Marketing Agreement, and because Cutter directly benefited from that Agreement, equitable estoppel prevents it from avoiding the Agreement's mandatory arbitration provision." *Id.* (citing *Int'l Paper*, 206 F.3d at 418; *Am. Bankers Ins. Grp., Inc. v. Long*, 453 F.3d 623, 627 (4th Cir. 2006); *Thompson v. Witherspoon*, 197 Md. App. 69, 88, 12 A.3d 685, 696 (2011)).

Cutter counters that a non-party to an arbitration agreement may only be bound to the agreement when it receives a "direct benefit" from that agreement. ECF 16 at 13 (quoting *Thompson*, 197 Md. App. at 86–87, 12 A.3d at 695).[5] In other words, Cutter argues that "the arbitration requirement only applies where 'one party attempts to hold another party to the terms of an agreement while simultaneously trying to avoid the agreement's arbitration clause." ECF 16 at 13 (quoting *R.J. Griffin & Co. v. Beach Club II Homeowners Ass'n*, 384 F.3d 157, 161 (4th Cir. 2004)). However, Cutter claims that the parties "structured the Redirection Agreement to define the governing relationship and obligations among them, independent of the Marketing Agreement." ECF 16 at 13. Cutter insists that it "does not derive a direct benefit from [the Marketing Agreement]—its rights to payment arise from the Redirection Agreement." *Id.*

Moreover, Cutter maintains that the case law relied on by CPS does not support its conclusion. According to Cutter, *Thompson*, 197 Md. App. 69, 12 A.3d 685, "directly undermines

[5] The quoted text does not appear on the page cited in plaintiff's brief.

the request of the Motion." ECF 16 at 14. There, the court characterized a "direct benefit" as one that is, *id.* (quoting *Thompson*, 197 Md. App. at 87–88, 12 A.3d at 696),

> deemed to be one contained within the provisions of the contract, which stands in contrast to an "indirect benefit" which flows as a result of the contract formation. Where a non-signatory benefits from the contractual relation of parties to an agreement but not the agreement itself, the non-signatory has not "directly benefitted;" hence an arbitration clause will not have binding effect. Similarly, an abstract advantage gained from the contract, intangible or indefinite, will not compel a non-signatory to arbitrate.

Cutter quotes the *Thompson* Court conclusion that appellants did not directly benefit from the agreement in question because the insurance policy in question was bought separately and in advance of any agreement. ECF 16 at 14 (citing 197 Md. App. at 88, 12 A.3d at 696). The *Thompson* Court reasoned: "The relationship between the insurance policy and the UBS Agreements is one of coincidence, not cause and effect." ECF 16 at 14 (citing 197 Md. App. at 88, 12 A.3d at 696).

Likewise, Cutter contends that *Brantley*, 424 F.3d 392, another case cited by CPS (ECF 16 at 15), "further refutes the relief sought by CPS in its Motion." *Id.* According to Cutter, the Fourth Circuit in *Brantley* "specifically rejected the application of equitable estoppel" because "'although the mortgage insurance relates to the mortgage debt, the premiums of the mortgage insurance are separate and wholly independent from the mortgage agreement.'" *Id.* (quoting *Brantley*, 424 F.3d at 397).

Cutter claims that it does not receive a "direct benefit" from the Marketing Agreement, as in the cases above, "because its right to collection from CPS arises in the Redirection Agreement." ECF 16 at 15. In Cutter's view, equitable estoppel "is meant to protect against a situation where, unlike here, it would be unfair for a party to rely on a contract when it works to its advantage, and repudiate it when it works to its disadvantage." *Id.* (quoting *Thompson*, 197 Md. App. at 83, 12 A.3d at 693) (internal quotation marks omitted). But, Cutter contends that it only seeks "to take

advantage" of the Redirection Agreement and does not rely on the Marketing Agreement. ECF 16 at 15. Cutter suggests that, as in *Thompson*, "'[t]here is nothing in the [Marketing Agreement] that addresses [CPS's] obligations to [Cutter].'" *Id.* (quoting *Thompson*, 197 Md. App. at 90, 12 A.3d at 697) (alterations in ECF 16). On the basis of these cases, Cutter concludes that "equitable estoppel does not support CPS's request to bind Cutter to an agreement it did not sign, does not receive a direct benefit from, and in which Cutter is not required to assert its claims against CPS." ECF 16 at 16.

The Fourth Circuit's discussion in *R.J. Griffin & Co.*, 384 F.3d 157, is instructive. There, a builder entered into a contract with a landowner to construct condominiums. *Id.* at 159. The contract contained an arbitration clause. *Id.* Subsequently, the landowner sold the condominium units and one of those buyers sued the builder for negligence and breach of an implied warranty. *Id.* The builder sought to compel arbitration on grounds of equitable estoppel, claiming that the complaint depended on the contract that contained an arbitration clause. *Id*. at 160. The Fourth Circuit observed that a nonsignatory seeks to "directly benefit" when its "'entire case hinges on its asserted rights under the . . . contract.'" *Id.* at 161 (quoting *Int'l Paper*, 206 F.3d at 418) (alteration added). The Court found that the owner did not directly benefit because its claims were also based in common law rights that were not contained within the contract that had an arbitration clause. *R.J. Griffin & Co.*, 384 F.3d at 164.

The claims Cutter asserts in the Complaint are based on the Redirection Agreement that it signed with CPS and Processing. ECF 1 at 6–7. Cutter does not rely on the Marketing Agreement between CPS and Processing. *Id.* Although the Redirection Agreement follows the Marketing Agreement, referencing it and creating and modifying obligations based on it, the Complaint does not "assert a breach of a duty created by the contract containing the arbitration clause." *Am.*

*Bankers Ins. Grp.*, 453 F.3d at 629. Rather, the Complaint asserts a breach of duty created by the Redirection Agreement, which contains no such clause. ECF 1 at 6–7. In other words, Cutter does not assert rights under the Marketing Agreement.

Moreover, the purpose of equitable estoppel is to preclude "a party from asserting his rights he otherwise would have had against another when his own conduct renders assertion of those rights contrary to equity." *Am. Bankers Ins. Grp.*, 453 F.3d at 627) (quoting *Int'l Paper*, 206 F.3d at 416). This is frequently characterized as a question of whether it would be "unfair" for the party to avoid arbitration. *OSRX, Inc. v. Anderson*, No. 23-1252, 2025 WL 1430648, at *4 (4th Cir. May 19, 2025) (quoting *Am. Bankers Ins. Grp.*, 453 F.3d at 627) (quoting *Wachovia Bank, Nat. Ass'n v. Schmidt*, 445 F.3d 762, 769 (4th Cir. 2006)); *see also Thompson*, 197 Md. App. at 83, 12 A.3d at 693.

However, CPS signed the Redirection Agreement with Cutter. There is no claim that either party was deprived of a fair opportunity to negotiate any term of that agreement. ECF 1-2. The Redirection Agreement "could have been written" to include an arbitration clause or to extend the arbitration clause of the Marketing Agreement, "but it plainly was not." *Jackson*, 176 F.4th at 323. In other words, CPS had an opportunity to enter into an arbitration agreement with Cutter, but did not do so. The claim that it would be inequitable for Cutter to avoid arbitration is not supported by any facts.

Again, CPS bears the burden to show that Cutter is bound to arbitrate under the Marketing Agreement. *Minnieland Priv. Day Sch.*, 867 F.3d at 456. CPS has failed to demonstrate that Cutter should be equitably estopped and required to arbitrate this dispute.

### C. Assignment

Defendant contends that Cutter "stands in the shoes of" Processing with respect to the Marketing Agreement. ECF 12-1 at 10. CPS presents this argument by characterizing Cutter's receipt of the Residual payments arising under the Marketing Agreement as an "assignment." *Id.* According to CPS, under Maryland contract law "an assignee 'stands in the shoes of the assignor' and 'has the same rights and **responsibilities** as its assignor.'" *Id.* (quoting *Nationstar Mortg. LLC v. Kemp*, 476 Md. 149, 156–57, 258 A.3d 296 (2021)) (emphasis in ECF 12-1).[6] And, CPS claims that, by accepting "an assignment" of Processing's contractual rights, "Cutter stepped into the Agent's contractual position for purposes of enforcing those rights and is therefore subject to the same dispute-resolution obligations attached to them." ECF 12-1 at 11.

In addition, CPS notes that the Redirection Agreement does not "replace, supersede, or modify the Marketing Agreement's dispute-resolution provisions." *Id.* Rather, "the parties represented that the Agreement remained 'in full force and effect' following the redirection of payments." *Id.* (quoting ECF 1-2, ¶ 4).

Cutter flatly rejects the characterization of the Redirection Agreement as an assignment. ECF 16 at 16. In its view, the Redirection Agreement "specifically identifies the parties' rights and obligations, including as it relates to the Marketing Agreement," and "*does not* assign the Marketing Agreement to Cutter or bind Cutter to its terms." *Id.* (emphasis in ECF 16). Instead, Cutter asserts, the Redirection Agreement only gives to Cutter the rights of Processing to the

[6] CPS discusses the case of *Erichsen v. RBC Capital Mkts., LLC*, asserting that there "the Fourth Circuit held that an assignee of a contract containing an arbitration clause could be compelled to arbitrate disputes arising under the assigned contract." ECF 12-1 at 10. However, *Erichsen* is not a Fourth Circuit decision. Indeed, CPS's citation for the case indicates it was decided in the District of Maryland: "883 F. Supp. 2d 562, 570 (D. Md. 2012)." *Id.* Yet, *Erichsen* was a decision of the Eastern District of North Carolina, *Erichsen v. RBC Cap. Mkts., LLC*, 883 F. Supp. 2d 562 (E.D.N.C. 2012).

Residuals and specifically states: "'*Each of CPS and Processing represents and warrants that the Marketing Agreements are in full force and effect*.'" *Id.* at 17 (quoting ECF 1-2, ¶ 4) (emphasis in ECF 16).

Moreover, Cutter observes: "Nowhere in the Redirection Agreement does Cutter agree to a wholesale assignment of the Marketing Agreement." ECF 16 at 17. According to Cutter, CPS, Processing, and Cutter could have drafted an agreement to assign the Marketing Agreement in whole or in part to Cutter, but they did not do so. *Id.* Rather, "the parties chose redirection—not assignment." *Id.*

The terms of the Redirection Agreement plainly assign to Cutter "all of Processing's rights, title, and interest in the Residuals." ECF 1-2, ¶ 1. This transfer is repeatedly referred to as an "assignment" in the Agreement. *Id.* However, the Redirection Agreement is equally explicit that this is not a full assignment of the Marketing Agreement wherein the assignee stands in the shoes of the assignor. *See id.* ¶ 2 (discussing what happens if Processing breaches the Marketing Agreement, *i.e.*, Processing remains a party to that agreement); *id.* ¶ 4 ("Each of CPS and Processing represents and warrants that the Marketing Agreements are in full force and effect.").

And, the case law cited by CPS does not show that an assignee of a partial assignment should be assumed to bear all obligations of the agreement on which the assignment is based. *See, e.g.*, *Nationstar Mortg.*, 476 Md. 149, 258 A.3d 296 (involving a full assignment of a mortgage); *Roberts v. Total Health Care, Inc.*, 349 Md. 499, 511, 799 A.2d 142, 148 (1998) (stating that an assignment of property transfers all interest in the property to the assignee, but not discussing other rights or obligations formed in the same contract); *Erichsen*, 883 F. Supp. at 570 (concluding that agreements, which contained arbitration provisions, had been assigned).

This issue was considered by the Maryland Court of Appeals in *Thompkins v. Mountaineer Invs., LLC*, 439 Md. 118, 94 A.3d 61 (2014).[7] There, the court noted that, "[w]hen the parties' agreement does not expressly state whether the assignment includes [related duties and liabilities], the law must do it for them." *Thompkins*, 439 Md. at 139, 94 A.3d at 74. In some cases, for instance, "the assignment of a contract for the sale of real property, Maryland law presumes that the assignee does not assume the assignor's obligations and liabilities." *Id.*, 94 A.3d at 74. In other cases, "such as an assignment of a contract for the sale of goods . . . Maryland law takes the opposite course and presumes that the assignee assumes the assignor's obligations." *Id.* at 139–40, 94 A.3d at 74.

The cases cited by CPS do not show whether, under Maryland law, such a presumption attaches to an assignment of residuals payments under a contract that involves neither real property nor goods. CPS has not met its burden to demonstrate that, under the principles governing assignment, Cutter is bound to arbitrate.

## IV. Conclusion

For the reasons stated above, I shall deny the Motion to Compel Arbitration and Dismiss the Complaint. An Order follows, consistent with this Memorandum Opinion.

Date: November 4, 2026

/s/
Ellen Lipton Hollander
United States District Judge

[7] In the Maryland general election held in November 2022, the voters of Maryland approved a constitutional amendment to change the name of the Maryland Court of Appeals to the Supreme Court of Maryland. And, the voters also approved a change in the name of the State's intermediate appellate court, from the Maryland Court of Special Appeals to the Appellate Court of Maryland. These changes went into effect on December 14, 2022. *See* Press Release, Maryland Courts, *Voter-approved constitutional change renames high courts to Supreme and Appellate Court of Maryland* (Dec. 14, 2022), https://perma.cc/TL89-QFKR. But, I shall refer to the courts by the names that were in effect when the cited decisions were issued.